UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ERNESTO BORRERO
HERNANDEZ,

      Petitioner,

      v.

                         Case No. 2:26-cv-530-KCD-DNF

WARDEN, FLORIDA SOFT SIDE
SOUTH, ACTING DIRECTOR
TODD LYONS, IMMIGRATION
AND CUSTOMS ENFORCEMENT;
ATTORNEY GENERAL PAMELA
BONDI,  US ATTORNEY FOR THE
MIDDLE DISTRICT OF FLORIDA,

      Respondents,

                                  /

## ORDER

Petitioner Ernesto Borrero Hernandez has filed a habeas corpus petition challenging his detention by U.S. Immigration & Customs Enforcement. (Doc. 10.)[1] He claims that his continued detention without a bond hearing violates the Constitution, the Administrative Procedure Act, and the immigration statutes themselves. The Government responds that the Court lacks jurisdiction to review his claims and, in any event, the law mandates his detention. (Doc. 17.) For the reasons below, the habeas petition is **DENIED**.

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

## I. Background

Hernandez is a Cuban citizen who illegally entered the United States on February 16, 2021. (Doc. 1 ¶ 12.) Important for reasons discussed below, he was detained at the border, processed for expedited removal, and then released after he made a claim for asylum. (Doc. 17-2 at 2.) His status was later updated to "granted parole under INA § 212(d)(5)(A)." (Doc. 10 ¶ 12.)

Over the next four years, Hernandez settled in Florida and applied for a green card under the Cuban Adjustment Act. (Doc. 10 ¶ 12.) But his immigration journey hit a roadblock in late 2025. On December 15, he attended a credible fear interview with U.S. Citizenship and Immigration Services in Miami. The asylum officer issued a negative credible fear determination. Borrero Hernandez was immediately taken back into custody. A week later, an immigration judge reviewed his case, affirmed the negative credible fear finding, and returned him to ICE for removal. (*Id.* ¶¶ 20-24.)

That brings us to the present. Hernandez remains locked up at Alligator Alcatraz. He has no bond hearing and no final order of removal. To end his ongoing confinement, he brought this habeas case.

## II. Legal Standard

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At

2

its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

### III. Discussion

Hernandez's habeas petition mounts a multi-front challenge to his confinement. He begins with the Fourth Amendment, arguing that the government unlawfully seized him in the interior of the United States without a warrant, probable cause, or reasonable suspicion. (Doc. 10 ¶¶ 32-35.) Next, he invokes the Administrative Procedure Act, claiming that immigration authorities acted arbitrarily by failing to follow their own regulations governing discretionary release. (*Id.* ¶¶ 37-41.) He also turns to the Fifth Amendment's Due Process Clause, contending that his ongoing detention without an individualized bond hearing impermissibly deprives him of his liberty. (*Id.* ¶¶ 42-46.) Finally, he points out the practical disconnect of his situation: because he was previously paroled into the country and has a pending application for lawful permanent residence under the Cuban Adjustment Act, he insists that keeping him locked up is fundamentally disproportionate and arbitrary. (*Id.* ¶¶ 47-51.)

3

The Government's first line of defense is a jurisdictional roadblock. Pointing to various jurisdiction-stripping provisions of the Immigration and Nationality Act ("INA"), the Government argues that this Court has no power to entertain Hernandez's claims. The Court has seen these arguments before, and the answer remains the same. *See Obando-Vargas v. Assistant Dir.*, No. 2:26-CV-265-KCD-NPM, 2026 WL 796804, at *1-2 (M.D. Fla. Mar. 23, 2026). Indeed, if the Government's sweeping interpretation were correct, *Zadvydas v. Davis*—the seminal case where the Supreme Court held it could consider a habeas challenge to unlawful, prolonged immigration detention—would have been stopped in its tracks before ever reaching the merits. The Court is satisfied it has jurisdiction to decide whether Hernandez's detention is lawful. *Zadvydas*, 533 U.S. 683, 688 (2001). To the extent Hernandez presses other claims or seeks remedies that do run into the INA's jurisdictional walls, the Court addresses those specific problems below. The substantive claims are addressed in turn.

### A. Fourth Amendment (Count One)

We need not spend long here. "[H]abeas is not a vehicle to redress defects in an initial arrest; its function is to determine whether the petitioner may lawfully remain in custody." *Palma v. Powell*, No. 7:26-CV-299-EGL-SGC, 2026 WL 701778, at *6 (N.D. Ala. Mar. 12, 2026). "If lawful grounds for detention exist, [Hernandez] is not entitled to release even if there were flaws

4

in his original arrest." *Id.* Because Hernandez attacks the mechanics of his seizure rather than the Government's present statutory authority to hold him, his claim must fail. *See also Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) (finding no jurisdiction to address detainee's claims that police "illegally procured an arrest warrant, that the agents illegally arrested him, and that the agents illegally detained him"); *Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1203 (11th Cir. 2016).

### B. Administrative Procedure Act (Count II)

Hernandez's claim under the APA fares no better. First, he has alleged this claim in a habeas petition, which is the wrong vehicle for the job. The writ of habeas corpus exists to challenge the fact or duration of physical confinement. It is not a catch-all funnel for standard administrative grievances. Trying to shoehorn a freestanding APA challenge into a habeas petition simply does not work. *See Fleurimond v. Noem*, No. CV-26-00037-PHX-MTL, 2026 WL 507542, at *3 (D. Ariz. Feb. 24, 2026). A habeas petition comes with a streamlined procedure, fast-tracked rules, and a nominal filing fee. An APA challenge, by contrast, is a standard civil action with a heftier filing fee and following the ordinary, more deliberate pace of the Federal Rules of Civil Procedure. Litigants cannot sidestep those standard requirements by simply slapping a habeas label on an administrative complaint. *See Alvarez v. Noem*, No. 5:26-CV-0013-JKP, 2026 WL 93972, at

5

*7 (W.D. Tex. Jan. 9, 2026); *Richmond v. Scibana*, 387 F.3d 602, 606 (7th Cir. 2004) (recognizing legal distinction between habeas cases and civil actions brought under APA, which have different filing fees and exhaustion provisions).

Second, the APA itself leaves no room for such claims. The APA operates as a fallback option, providing a right of judicial review only when "there is no other adequate remedy in a court." 5 U.S.C. § 704. But Hernandez has an adequate remedy—the very habeas petition he filed to get through the courthouse doors. *See Trump v. J.G.G.*, 604 U.S. 670, 674 (2025) (Kavanaugh, J., concurring). Because the writ of habeas corpus provides a fully adequate avenue to test the legality of his custody—which is the only thing Hernandez is challenging here—the APA simply leaves no room for these redundant claims. *See Fleurimond*, 2026 WL 507542, at *3, *Rivera v. Noem*, No. 1:25-CV-01289 KWR-KBM, 2026 WL 381309, at *7 (D.N.M. Feb. 11, 2026).

Even looking past these procedural problems, Hernandez would fail on the merits. He claims that "ICE was required to conduct an individualized parole or release assessment." (Doc. 10 at 9.) Not so. As explained below, Hernandez is an "applicant for admission" under 8 U.S.C. § 1225(a)(1). Section 1225 "mandate[s] detention of applicants for admission until certain proceedings have concluded." *Jennings v. Rodriguez*, 583 U.S. 281, 297

6

(2018). The Government has only one alternative under this framework—it can temporarily release the noncitizen on humanitarian parole. *Id.* at 288. But "[u]nder the INA, parole is a discretionary mechanism." *Khubiev v. Baltasar*, No. 25-CV-03955-STV, 2026 WL 864237, at \*2–3 (D. Colo. Mar. 30, 2026).

### C. Due Process (Count III)

Hernandez next claims that he is entitled to a bond hearing under the Fifth Amendment. (Doc. 10 at 10.) The Court cannot agree.

Sections 1225 and 1226 of the INA govern the detention of noncitizens before a final order of removal. The former provision covers "inadmissible arriving aliens" who are "present in the United States [but have] not been admitted." 8 U.S.C. § 1225(a)(1). So-called "'applicants for admission' in the language of the statute." *Jennings*, 583 U.S. at 297. Pertinent here, § 1225 "mandate[s] detention of applicants for admission until certain proceedings have concluded." *Id.* So aliens falling under § 1225 are categorically not entitled to a bond hearing.

On the other hand, § 1226 has historically "authorize[d] the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings[.]" *Jennings*, 583 U.S. at 289 (emphasis added). Section 1226(a) sets out a discretionary detention framework for aliens arrested and detained "[o]n a warrant issued by the Attorney General."

7

8 U.S.C. § 1226(a). While the arresting immigration officer makes an initial custody determination, noncitizens detained under § 1226(a) may appeal that decision in a bond hearing before an immigration judge. *See* 8 C.F.R. §§ 1236.1(c)(8), (d)(1). "Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings*, 583 U.S. at 306.

Hernandez was apprehended at the border while seeking admission. That puts him squarely under § 1225. *See, e.g., Lopez v. Hardin*, No. 2:25-CV-830-KCD-NPM, 2025 WL 3022245, at *4 (M.D. Fla. Oct. 29, 2025) ("[Section] 1225 applies to noncitizens arriving at a border or port and are presently seeking admission into the United States.").

An alien "who arrives in the United States (whether or not at a designated port of entry[)] shall be deemed . . . an applicant for admission." 8 U.S.C. § 1225(a)(1). Hernandez concededly meets this definition. He was stopped at the border, had no legal status, and sought entry. *See Jennings*, 583 U.S. at 287 ("[A]n alien who arrives in the United States . . . but has not been admitted, is treated as an applicant for admission."). To this day, he is still seeking admission as a lawful permanent resident.

As mentioned, applicants for admission who are inadmissible must be detained pending removal proceedings. *Jennings*, 583 U.S. at 297. The Government has only one alternative under this framework—it can

8

temporarily release the noncitizen on humanitarian parole. *Id.* at 288. But make no mistake, this is not a lawful entry. A paroled noncitizen has not been admitted to the country. Instead, the law treats them as if they never crossed the threshold. When the parole ends, they return to custody and are treated "in the same manner as that of any other applicant for admission." *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). So, while Hernandez may have physically spent time in the interior of the United States after his release, the law places him exactly where he started—at the border, subject to § 1225. *See Campbell v. Almodovar*, No. 1:25-CV-09509 (JLR), 2025 WL 3538351, at *6 (S.D.N.Y. Dec. 10, 2025). "[A]lthough aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Moore v. Nielsen*, No. 418CV01722LSCHNJ, 2019 WL 2152582, at *3 (N.D. Ala. May 3, 2019); *see also Singh v. Noem*, No. CIV 25-1110 JB/KK, 2026 WL 146005, at *36 (D.N.M. Jan. 20, 2026).

Contrary to Hernandez's claim, the Fifth Amendment does not step in to provide a bond hearing that is absent from § 1225. The Fifth Amendment requires the government to provide due process before depriving a person of life, liberty, or property. *Dep't of State v. Munoz*, 602 U.S. 899, 909-10 (2024). It is "well established that the Fifth Amendment entitles aliens to due

9

process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 305 (1993); *Zadvydas*, 533 U.S. at 693-94 ("[T]his Court has held that the Due Process Clause protects an alien subject to a final order of deportation.").

At the same time, the Supreme Court has repeatedly acknowledged that "the nature of protection [under the Due Process clause] may vary depending upon [immigration] status and circumstance." *Zadvydas*, 533 U.S. at 694; *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application . . . . [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.").

For noncitizens who arrive at the border without lawful status—even if they manage to physically enter the country—the Due Process Clause is constrained. The Supreme Court's decision in *Dep't of Homeland Sec. v. Thuraissigiam* shows exactly how this works. 591 U.S. 103 (2020). The petitioner in that case tried to cross the border illegally and was apprehended a mere 25 yards into the United States. The government placed him in expedited removal proceedings under § 1225(b)(1) and kept him in continuous custody. *Id.* at 114. When his asylum claim failed, he turned to federal court. He filed a habeas petition asking for a do-over—a court order directing the

government to give him another opportunity to apply for asylum relief. *Id.* at 115.

The Supreme Court said no, holding (among other things) that the Due Process Clause did not guarantee the petitioner judicial review of his asylum denial. *Id.* at 139. The Court explained that granting procedural due process rights to arriving aliens beyond what Congress had prescribed "is contrary to more than a century of precedent." *Id.* at 138. That precedent establishes a stark but unyielding rule: for foreigners who have never been admitted into the country, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Id.* (emphasis added). This approach stems from a simple constitutional reality— the political branches hold plenary authority over our borders. And if you have the sovereign power to keep someone out, you necessarily possess the power to set the procedural ground rules for making that determination. *Id.* at 139.

The takeaway from *Thuraissigiam* is plain: an arriving alien "has only those rights regarding admission that Congress has provided by statute." *Id.* at 140; *see also Mendoza-Linares v. Garland*, 51 F.4th 1146, 1167 (9th Cir. 2022) (explaining that any rights "an alien seeking initial admission to the United States" may have "in regard to removal or admission are purely

statutory in nature and are not derived from, or protected by, the Constitution's Due Process Clause").

Aliens "who arrive at ports of entry" and are released into the United States pending removal, as occurred here, "are treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139; *see also Heng Meng Lin v. Ashcroft*, 247 F. Supp. 2d 679, 683 (E.D. Pa. 2003) ("An excludable alien may be physically allowed into the country while his admission is being considered, but under the entry fiction is still considered to be at the border awaiting entry."). That means Hernandez is legally no different from an applicant standing at the border, leaving him to claim "only those rights regarding admission that Congress has provided by statute." *Jandres-Ordonez v. Bondi*, No. 6:25-CV-084-H, 2026 WL 274493, at \*12 (N.D. Tex. Jan. 23, 2026); *see also Liang v. Almodovar*, No. 1:25-CV-09322-MKV, 2025 WL 3641512, at \*5 (S.D.N.Y. Dec. 15, 2025); *Ayala v. Harper*, No. 1:26-CV-204-CLM-GMB, 2026 WL 501113, at \*10 (N.D. Ala. Feb. 23, 2026).

Section 1225 provides the procedural boundaries Congress set for arriving aliens. The statute "mandate[s] detention of applicants for admission until certain proceedings have concluded" and says nothing "whatsoever about bond hearings." *Jennings*, 583 U.S. at 297. Since Congress drew the blueprint for arriving aliens, choosing mandatory detention, Hernandez cannot invoke the Fifth Amendment to demand a bond hearing. For an

12

applicant legally standing at the nation's door, the statutory text provides the beginning and the end of the constitutional inquiry. That means Hernandez's due process challenge necessarily fails. *See Arana v. Arteta*, No. 1:26-CV-240-GHW, 2026 WL 279786, at *5-6 (S.D.N.Y. Feb. 3, 2026).

Hernandez invokes *Zadvydas v. Davis*, 533 U.S. 678 (2001) to argue that his continued custody without a bond hearing has become unlawfully indefinite. (Doc. 10 at 10.) In *Zadvydas*, the Supreme Court held that the government cannot hold an alien indefinitely under 8 U.S.C. § 1231(a)(6)—the statute governing detention *after* a final order of removal has been entered. To avoid serious constitutional concerns, the Court read an implicit time limit into that statute, requiring release if removal is no longer reasonably foreseeable. *Zadvydas*, 533 U.S. at 689.

But *Zadvydas* provides Hernandez no help here for a simple and fundamental reason: he is detained under a completely different statutory scheme. Hernandez does not yet have a final order of removal. Instead, because his parole was terminated, he is treated as an applicant for admission detained pending the outcome of his removal proceedings under 8 U.S.C. § 1225(b). *See Diaz Patino v. Villegas*, No. 1:25-CV-276-H, 2026 WL 673166, at *4 (N.D. Tex. Mar. 9, 2026). And the Supreme Court has rejected the attempt to transplant *Zadvydas*'s implicit time limits onto § 1225(b).

13

*Jennings*, 583 U.S. at 296-99; *see also Erbite v. Ripa*, No. 2:26-CV-558-JES-NPM, 2026 WL 776143, at \*2 (M.D. Fla. Mar. 19, 2026).

The Court in *Jennings* explained that the two statutes are drafted entirely differently. The post-removal statute at issue in *Zadvydas* states that the government "may" detain certain aliens, a permissive word that left the Court room to impose a reasonable temporal limit. *Jennings*, 583 U.S. at 299-300. But § 1225(b) is unequivocal. It mandates that applicants for admission "shall be detained" until their removal proceedings conclude. *Id.* at 297. As the Supreme Court put it, the text of § 1225(b) says nothing "whatsoever about bond hearings" and leaves no interpretive room for a *Zadvydas*-style saving construction. *Id.*; *see also Gueye v. Sessions*, No. 17-62232-CIV, 2018 WL 11447946, at \*2 (S.D. Fla. Jan. 24, 2018) ("*Zadvydas* did not analyze detention in the context of expedited removal proceedings.").

To be sure, *Jennings* did not resolve every question in this arena. When the Supreme Court declined to rewrite § 1225 to include an implicit bond hearing, it explicitly left for another day the constitutional fallback: whether prolonged mandatory detention under that statute might independently violate the Due Process Clause. *Id.* at 312. And immediately following *Jennings*, some courts did find that aliens proceeding under § 1225(b) have at least some base level of due process rights against unreasonable detention. *See, e.g.*, *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1147 (9th Cir.

14

2020) (upholding a preliminary injunction to a class of §1225(b) detainees because "plaintiffs were likely to succeed on their claim that they are constitutionally entitled to individualized bond hearings before a neutral decisionmaker").

But the Supreme Court has since firmly closed that door in *Thuraissigiam*. That case shows how the Due Process Clause operates—or, more accurately, how it is constrained—when it comes to individuals, like Hernandez, who have not been lawfully admitted.

The interplay between the two decisions is straightforward. *Jennings* hypothesized that, at some point, prolonged detention might offend due process. But *Thuraissigiam* clarified exactly what process is "due" to an arriving alien. As mentioned, the Court reaffirmed its "century-old rule" that "Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause." *Thuraissigiam*, 591 U.S. at 107, 139.

That rule resolves the constitutional question here. Because Hernandez's temporary parole was terminated, the law treats him as though he is still standing at the border, knocking on the door. *Id.* at 139 ("[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at

15

the border."). For individuals in this posture, the Due Process Clause is not a roving mandate for federal judges to construct a balancing test. Instead, an arriving alien's constitutional rights are coextensive with his statutory rights. And because Congress unequivocally mandated detention for arriving aliens in § 1225 without providing for a bond hearing, the Due Process Clause does not step in to supply one. In this specific context, the statutory floor is also the constitutional ceiling. *See, e.g.*, *A.E. v. Powell*, No. 7:26-CV-337-EGL-NAD, 2026 WL 782294, at *7 (N.D. Ala. Mar. 19, 2026); *de la Rosa Espinoza v. Guadian*, No. 20-3126-JWL, 2020 WL 3452967, at *6 (D. Kan. June 24, 2020).

One can certainly understand Hernandez's frustration with his current position, waiting in a detention cell for a year while his immigration case inches forward. Yet this Court cannot use judicial fiat to conjure a due process claim just to ease the wait. We are not staring down the barrel of indefinite detention—the constitutional danger the Supreme Court found so problematic in *Zadvydas*. Garcia's current custody has a clear statutory endpoint: it lasts only "until removal proceedings have concluded." *Jennings*, 583 U.S. at 299. And if he eventually receives a final order of removal only to have his deportation stall, the doors of the courthouse will open for him to seek relief under *Zadvydas*. Because the existing framework comes with a

16

built-in expiration date, there is no reason to engineer a constitutional workaround.

**D. Pending Cuban Adjustment Act Application (Count IV)**

Hernandez's final claim tries a different tack. He points to his pending application for lawful permanent residence under the Cuban Adjustment Act. Because he was paroled into the United States back in 2021 and has spent several years building a life here, he argues that tossing him back into a detention cell now is "arbitrary, disproportionate, and contrary to law." (Doc. 10 at 11.)

It is easy to understand Hernandez's frustration. But the law does not view his situation through that practical lens. Under the INA, a paroled noncitizen has not actually been admitted to the country. Instead, the law relies on a legal fiction: it treats paroled individuals as if they never crossed the threshold. As the Supreme Court has said, when a period of parole ends, the noncitizen is returned to custody and treated "in the same manner as that of any other applicant for admission." *Jennings*, 583 U.S. at 288. So, while Hernandez physically spent years living in the Florida, he remains subject to mandatory detention under § 1225.

Hernandez offers no legal authority to support the idea that a pending application for adjustment of status—even a highly promising one under a humanitarian statute like the Cuban Adjustment Act—overrides the

17

statutory command that applicants for admission must be detained while their removal proceedings play out. (*See* Doc. 10 at 11.) A petitioner cannot just drop a legal label on the table and expect the dots to connect themselves. In our adversarial system, a party has to do the heavy lifting of framing the issues for decision. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022). The Court will not do that work for him. Because Congress mandated Hernandez's detention, and he has not shown how that is unlawful, the Government's decision to hold him cannot be set aside as an arbitrary or capricious action.[2]

## IV. Conclusion

Hernandez is legally situated at the border and subject to mandatory detention under 8 U.S.C. § 1225. Because that statute provides no right to a bond hearing, and the Due Process Clause does not step in to supply one for an arriving alien, his continued custody is lawful. Accordingly, Hernandez's Amended Petition for a Writ of Habeas Corpus (Doc. 10) is **DENIED**. The Clerk is directed to terminate any pending motions and close the case.

---

[2] Hernandez tacks on two final counts—Five and Six—at the end of his petition. (Doc. 10 at 11-12.) But labels aside, a quick read shows these are not standalone legal claims. They are simply arguments about the equities of his case and the specific remedy he wants: immediate release. Because these remedial requests rise and fall with the substantive claims resolved above, the Court need not address them separately.

18

**ORDERED** in Fort Myers, Florida on April 23, 2026.

Kyle C. Dudek
United States District Judge